MILLER, TRUSTEE, *v.* MARYLAND CASUALTY COMPANY.

4-7351                                    180 S. W. 2d 581

Opinion delivered May 22, 1944.

*Hill, Fitzhugh & Brizzolara,* for appellant.[a]

*Daily & Woods,* for appellee.

McFADDIN, J. This appeal presents questions concerning foreign judgments, creditors' suits, and trusts.

The Maryland Casualty Company recovered judgment *in personam* in the United States District Court for the Southern District of Texas against Mrs. Anne Wood Locher for $13,000, and a *nulla bona* return was made on the execution issued on that judgment. The judgment and return were duly authenticated under the United States statutes. (U.S.C.A. Title 28, § 687.) Thereafter, this present suit was filed by the Maryland Casualty Company in the nature of a creditors' suit, or equitable execution, in the chancery court of Crawford county,

Arkansas, based on the unsatisfied Texas Federal judgment and return evidenced by the authentication previously mentioned. The defendants named in this Arkansas suit were Mrs. Locher, individually, and Dell Miller, Harry Wood and D. L. Hodges, as Trustees under the wills of Norma Wood, deceased, and Margaret Wood, deceased. The complaint alleged that the administration of each of the estates had long been closed and Mrs. Locher was beneficiary of one share in each trust estate for and during her natural life and that the trustees of the two wills were handling the trust funds of the estates and were making annual payments to Mrs. Locher of all of her share of income; and the complaint prayed that the annual payments going to Mrs. Locher should be paid to the Maryland Casualty Company during the life of Mrs. Locher until the Texas judgment should be satisfied. The complaint alleged the non-residency of Mrs. Locher and her insolvency and the absence of any property belonging to her in the State of Arkansas. Mrs. Locher was served with summons in the State of Texas under the provisions of § 1374 of Pope's Digest. She made no appearance or defense in this case. The three trustees were personally summoned and made the defenses which we will discuss herein. Mrs. Locher testified by deposition taken on behalf of the trustees.

The Crawford Chancery Court found that the balance due on the Texas judgment was $12,042 with interest at 6 per cent. from October, 1940; and that Mrs. Locher was a citizen of Texas and had no property in Texas or elsewhere subject to execution or attachment except her equitable interest in the trust here involved; and that under the wills involved Mrs. Locher was entitled to receive for her life the income from one share in the trust; and that this was not a spendthrift trust. Accordingly the chancery court enjoined the trustees from paying to Mrs. Locher any of the future net income of her share of the trust and decreed that the trustees should pay the future income of Mrs. Locher's share of the trust, during the lifetime of Mrs. Locher to the Maryland Casualty Company until the said judgment of $12,042

should have been paid in full. From this decree the trustees (appellants) have brought this appeal. Six questions are presented either directly or inferentially; and we proceed to state and discuss them.

### I. *Is A Cause of Action Stated?*

At the outset we have a creditor's suit based on a foreign judgment. Does the foreign judgment have to be domesticated before a creditor's suit can be maintained? In 14 Am. J. 689 in the discussion of creditors' suits the general rule is recognized: "The prevailing rule is that a foreign judgment is not sufficient to support a creditor's bill to reach assets of the defendant which cannot be reached in proceedings at law, and that, in the absence of statute to the contrary, the creditor is required to set forth in his bill a judgment in the jurisdiction where the suit in equity is brought or to show that it is impossible to obtain such a judgment in any court within such jurisdiction."

But in continuing the discussion of the same subject there are mentioned, in the same authority, several recognized exceptions and some of these exceptions are (1) impossibility or impracticability, (2) where judgment dispensed with by statute, and (3) nonresidence or absence of the debtor. On the first of these exceptions it is stated in 14 Am. J. 695: "The general rule that equity will not enforce a demand by creditor's bill until a judgment has been obtained and an execution issued thereunder and returned unsatisfied, or at least partially unsatisfied, is not applied without exception; its application is limited by the reasons which support it. The impossibility, impracticability, or futility of exhausting the remedy at law has been held to be a sufficient excuse for not doing so."

The second exception to the rule is stated in 14 Am. J. 695 as follows: "In some jurisdictions the necessity of a previous judgment as a condition precedent to obtaining equitable relief under a creditor's bill is dispensed with by statute. A statute authorizing bills by creditors to reach and apply to the payment of a debt any prop-

erty right, title, or interest, legal or equitable, of a debtor, which cannot be attached or taken at execution in a suit at law against such debtor, has been construed to authorize the creditor to proceed without first obtaining judgment. Such statutes, being remedial, are given a liberal construction to effect the object designed." Our own case of *Riggin* v. *Hillard*, 56 Ark. 476, 20 S. W. 402, 35 A. S. R. 113 is cited to sustain the text.

On the third exception (nonresidence of defendant), the rule is stated in 14 Am. J. 697 as follows: "The weight of authority supports the view that nonresidence or absence of the debtor, as where he is a fugitive from justice, obviates the necessity of a prior judgment at law, at least where such nonresidence or absence renders it impossible or impracticable to obtain such a judgment and there is no adequate remedy by which the debtor's property can be reached. The theory underlying the rule is that a prior judgment is required in any case merely because it is the best evidence that the creditor has exhausted his remedies at law, and that where the nonresidence or absence of the debtor has rendered it impossible to obtain this evidence, equity may act upon other evidence which it finds is sufficient to show that the creditor has no adequate remedy at law. Equity does not permit a nonresident debtor to escape payment of the just claim of a resident creditor because his absence from the jurisdiction prevents the creditor from obtaining a personal judgment against him, and there is no other adequate remedy at law to reach the debtor's property."

Among other authorities cited to sustain the text there is the annotation in 38 A. L. R. 272. See, also, 21 C. J. S. "Creditors' Suits," § 45. We think that the case at bar comes within one if not all of the three exceptions to the general rule as has been pointed out. These exceptions would dispense with the necessity of first obtaining any judgment. So even if we consider the Texas judgment as mere evidence of indebtedness, we reach the conclusion that the Texas judgment and the *nulla bona* return thereon and the proof of Mrs. Locher's

insolvency and absence from this state dispense with the necessity of a domestic judgment; and to that extent a cause of action was stated.

## II. *Is There Sufficient Service?*

Since Mrs. Locher was not in Arkansas to be served and did not enter her appearance, there was therefore no personal service on her in this state. Neither did plaintiff have a warning order published, nor attorney *ad litem* appointed, nor statutory writ of attachment or garnishment issued against the *res* (the trust); and so appellants argue that there is no semblance of service to support judgment.

But it must be remembered that the plaintiff did name Mrs. Locher as defendant in this case and did cause a copy of the complaint to be served on her in Texas, as provided by § 1374 of Pope's Digest. Because of § 8226 of Pope's Digest, this service under § 1374 of Pope's Digest did not support a personal judgment against Mrs. Locher, but this service under § 1374 of Pope's Digest notified Mrs. Locher of this suit just as effectively— perhaps even more effectively—than would publication of warning order and appointment and report of attorney *ad litem*. See *Martin* v. *Gwynn*, 90 Ark. 44, 117 S. W. 754; *Sinclair Refining Co.* v. *Bounds*, 198 Ark. 149, 127 S. W. 2d 629; *Bank of Dover* v. *Jones*, 192 Ark. 740, 95 S. W. 2d 92. While § 5378 ff of Pope's Digest seems to envision proceedings on local judgments against local defendants, still § 5381 says that even in those cases there need be no attachment, affidavit, or bond. We, therefore, hold that since personal service could not be obtained on Mrs. Locher in Arkansas the nonresidence service under § 1374 and § 1379 of Pope's Digest amply dispensed with any further constructive service, and that the service under § 1374 was sufficient to support any judgment in this case except one *in personam*. The judgment of the Crawford Chancery Court does not purport to be *in personam* against Mrs. Locher, but merely to fix the amount of the balance of the indebtedness due by her on the Texas Federal judgment, and to direct the trustees to make payments to the plaintiff instead of to

Mrs. Locher. Section 8225 of Pope's Digest invoked by appellants affords them no support, because, here, there was a lien created by the judgment of the Crawford Chancery Court and an order to pay made in the same judgment.

Appellants cite *Norman* v. *Pool,* 70 Ark. 127, 66 S. W. 433; *St. Louis Ry. Co.* v. *McDemitt,* 91 Ark. 112, 120 S. W. 831; *New York Life Insurance Co.* v. *Cherry,* 185 Ark. 984, 50 S. W. 2d 584, and other cases to sustain the contention that judgment cannot be rendered against a garnishee until there is a judgment against the debtor. This rule of law is fully established, but has no application here. The decree of the Crawford Chancery Court established the amount of the indebtedness due by Mrs. Locher, just as in any case of attachment or garnishment on constructive service, and fully in accordance with § 8225 of Pope's Digest, and directed the trustees to pay to the Maryland Casualty Company whatever might thereafter be due Mrs. Locher by the trustees. This was also in keeping with § 8219 of Pope's Digest, because under § 1379 of Pope's Digest Mrs. Locher had let the time expire in which to make defense.

Appellants cite *Coyne* v. *Plume,* 90 Conn. 293 (1916) 97 Atl. 337 to support their contention that the Crawford Chancery Court acquired no jurisdiction. In the Connecticut case the court held that a statutory writ of attachment would not support a proceeding *in rem* when there was nothing due the nonresident defendant at the time of the attachment. We cannot follow that case because we have held that unmatured claims may be the subject of garnishment. *Harris* v. *Harris,* 201 Ark. 684, 146 S. W. 2d 539. Certainly Mrs. Locher had a claim against the trust fund, and this could be reached by creditors' bill. Thus the Connecticut case is without force in this state.

Appellants cite *Pennoyer* v. *Neff,* 95 U. S. 714, 24 L. Ed. 565 in their claim that there was no sufficient service to support the decree rendered; but the plaintiff's procedure in the case at bar is in full accord with the rule

laid down in *Pennoyer* v. *Neff*. Mr. Justice FIELD, there, said: "Substituted service by publication, or in any other authorized form, may be sufficient to inform parties of the object of proceedings taken where property is once brought under control of the court by seizure or some equivalent act." In the case at bar this rule was complied with by service on Mrs. Locher under § 1374 of Pope's Digest, and the property (the trust) was brought under control of the court by the service on the trustees.

We, therefore, reach the conclusion that there was sufficient service to support the decree rendered.

### III. *Is This A Case for Equitable Relief?*

By this question, we mean—do courts of equity grant relief in a creditor's suit like the one at bar? We have in our own reports a number of cases of creditors' suits. See *Riggin* v. *Hilliard*, 56 Ark. 476, 20 S. W. 402, 35 A. S. R. 113; *William R. Moore Dry Goods Co.* v. *Ford*, 146 Ark. 227, 225 S. W. 320, 226 S. W. 139, and other cases under the title of "Creditors' Suits" in West's Arkansas Digest. But none of our cases has facts bearing any great similarity to the case at bar. So we turn to text books and cases from other jurisdictions. Discussions on general equity jurisdiction of creditors' bills may be found in 21 C. J. S. 1058 ff and in 14 Am. J. 681. Turning to cases: *Earl* v. *Grove*, 92 Mich. 285 (1892) 52 N. W. 615 gives strong support to position of the appellee in the case at bar. The Sligh Company obtained judgment against Kendall in New York State and had execution issued and returned *nulla bona*. Kendall's father died leaving an estate in Michigan. The Sligh Company filed suit in equity in Michigan against Kendall and the administrator of his father's estate, alleging the New York judgment, execution, return, absence of Kendall from Michigan, and no property of Kendall in Michigan other than the proceeds of the father's estate; and prayed equitable garnishment and execution against the administrator. The Supreme Court of Michigan held that the suit was properly brought and could be maintained even in the absence of

a domestic judgment in Michigan. The court said: "There are, and always have been, exceptions to the general rule in special cases; as, where a judgment cannot be obtained because the debtor . . . is a nonresident." Considering the Michigan statute, (like § 5278 of Pope's Digest of Arkansas), the court recognized that the statute only applied to home judgments rather than the foreign judgments, but stated that the statute pointed the way to, and recognized, the general equity power in such cases; and that the general equity power extended to foreign judgments.

*McCartney* v. *Bostick* (1865) 32 N. Y. 53, also supports the appellee. McCartney recovered judgment against Bostick in Minnesota, and had execution and return *nulla bona*. McCartney learned that Bostick had an interest in lands in New York covered by fraudulent conveyances and McCartney brought suit in New York to remove the fraudulent conveyances and have Bostick declared the real owner (*cestui que trust*) and the legal title holder to be declared the trustee. Thus trusts, foreign judgments, and creditor's suit, were some of the questions involved. In the opinion by Justice Davis, the court discussed the contention that the New York suit was based on a foreign judgment and not on a judgment domesticated in New York; but the court recognized that no judgment *in personam* could be obtained against Bostick in New York and said: "Does equity demand that a legal remedy shall be exhausted, where none exists, before it will enforce a trust created by statute, of which it alone has jurisdiction? The rule fails where the reason for it ceases, *'Cessante ratione legis cessat ipse les'* is a maxim as well in equity as at law. Courts of equity 'have adopted principles exceedingly broad and comprehensive in the application of their remedial justice . . .' "

In discussing the necessity of a domestic judgment, the court said: "But if it be essential to jurisdiction in this case, I am prepared to go farther, and hold that the remedy of plaintiffs at law has been exhausted in this case, within the true meaning of the rule. So far as the

effect of the judgment is to establish the indebtedness, it has been accomplished by the judgment recovered in Minnesota. That judgment appears to have been recovered upon personal service of process.''

On the exhaustion of the remedy at law, the court said: ''. . . when that is shown to be impossible under our law, it inevitably follows, that the law is exhausted. Our law is not therefore subject to the reproach of creating by statute a trust for foreign creditors in property within our state, yet withholding from them all power of reaching and applying it.''

These two cases of *Earl* v. *Grove* and *McCartney* v. *Bostick* have been frequently cited in various jurisdictions and clearly indicate the trend of authority. For some of the other authorities in accord with the views herein expressed, ,see: *Heaton* v. *Dickson,* 153 Mo. App. 312 (1910), 133 S. W. 159; *Huntington* v. *Jones,* 72 Conn. 45 (1899), 43 Atl. 564; *Adler, Goldman Comm. Co.* v. *Williams* (U. S. Dist. Court, Ark., 1914), 211 Fed. 530; *Williams* v. *Adler, Goldman Comm. Co.* (U. S. 8th C. C. A., 1915), 227 Fed. 374; *Kraft* v. *Scott,* 278 Mich. 162, (1936), 270 N. W. 253; *Demuth* v. *Kemp,* 159 App. Div. 422 (1913), 144 N. Y. S. 690; *Bateman* v. *Hunt,* 46 Misc. 346 (1905), 94 N. Y. S. 861, and other cases cited in annotation in 38 A. L. R. 269. This annotation is on the subject: ''Nonresidence or absence of debtor as obviating necessity of procuring judgment as condition of creditors' bill.'' And it is there stated: ''The great weight of authority supports the view that the nonresidence or absence of the defendant obviates the necessity of a prior judgment at law at least where such nonresidence or absence renders it impossible or impracticable to obtain such a judgment''; and in 123 A. L. R. 1293, there is an annotation on the subject, ''Jurisdiction and Power of Equity to Subject Legacy, Devise or Distributive Share in Estate to Claim of Creditor of Legatee, Devisee, or Distributee,'' which annotation affords ample support for the views herein expressed. Cases from over a score of jurisdictions are cited to sustain the statement: ''The jurisdiction of equity, under proper circumstances, to

afford a creditor a remedy, by way of a creditors'. bill or otherwise, by which he may subject to his claim the debtor's interest in a decedent's estate has been sustained, or at least recognized or assumed, in numerous cases''; and to the same effect, see Restatement of the Law of Trusts, § 147.

We, therefore, conclude that the chancery court correctly entertained jurisdiction in this case.

### IV. *Is A Spendthrift Trust Shown?*

The appellants are trustees of the will of Norma Wood, deceased, and also of Margaret Wood, deceased. The wills are identical insofar as the issues in this case are concerned; and we refer to ''the will,'' meaning the one of each testatrix. In paragraph six of the will the trustees were appointed ''with full power . . . to manage, control, sell, lease, and dispose of the trust estate or funds or any part thereof.'' In paragraphs nine and ten of the will, the residue of the estate was to be divided by the trustees into two equal parts. One of the parts went to H. C. Wood. In paragraph twelve of the will the other part was to be divided by the trustees into nine equal subparts called ''shares.'' Thus a share is one eighteenth of the trust residue. In paragraph fifteen Mrs. A. H. Locher was to receive one share for life. Mrs. A. H. Locher is the same person as Mrs. E. H. Locher and the paragraph fifteen reads as follows:

''Fifteenth: I give, devise and bequeath to Mrs. E. H. Locher, daughter of G. R. Wood, deceased, out of that part named in paragraph twelve, the following:

''One (1) share of my estate, being one of the nine parts mentioned in paragraph twelfth of this will, to have and to hold during her natural life, and at her death to go to the heirs of her body, share and share alike.''

In paragraph twenty-two of the will the authority of the trustees as stated in paragraph six (*supra*) was modified in language as follows:

''Twenty-second: The trust herein created in the hands of my trustees shall be governed in the following clauses, to-wit:

"(a) My trustees shall annually render to each beneficiary a written statement of the transactions of the trust estate or funds during the next preceding year.

"(b) My trustees shall be allowed a reasonable compensation for the services performed, such compensation to be paid out of the income of the trust estate or funds.

"(c) My trustees are not to exceed the income of the trust estate or funds, in whatever form it may be, unless in case of *dire extremity* of a beneficiary, or unless in case of misfortune or unavoidable accident, the value of the trust estate shall be diminished, and imperious necessity affecting a beneficiary or his family should, in the judgment of the trustees, render it proper to use some portion of the capital; but then only so long as the urgency of the necessity shall continue; and the waste occasioned to the capital thereby shall be repaired out of the future income of the trust fund, if, in the judgment of the trustees, the same can be done without serious inconvenience to the beneficiary or his family. As to what is dire extremity and imperious necessity, and what amount of the capital is necessary to be used, the trustees shall exercise their best discretion."

In 1935 (sometime after the death of the last surviving testatrix) there was a suit in the Crawford chancery court to construe the wills. This suit was brought by the trustees against all of the beneficiaries. The decree in that suit did not undertake to answer the questions involved in the case at bar and the decree in the "construction suit" does not settle any of the questions here involved; but it is worth noting that the same chancellor who rendered the decree in the "construction suit" also rendered the decree in the case at bar; and in the construction suit the court held: "The construction of the said aforesaid clauses of said will is that the trustees shall hold each of said nine parts of said half of the estate and pay the income thereof to each of the nieces during her natural life and on her death then deliver unto the 'heirs of her body' the said ninth share."

We take it as conceded that under these wills Mrs. Locher receives certain income *for her life.* The question now posed is whether the will, viewed particularly in the light of the language of paragraph twenty-two (*supra*), created a spendthrift trust for the benefit of Mrs. Locher for her life.

We have several cases in Arkansas on spendthrift trusts: *Booe* v. *Vinson,* 104 Ark. 439, 149 S. W. 524; *Bowlin* v. *Citizen Bank & Trust Company,* 131 Ark. 97, 198 S. W. 288, 2 A. L. R. 575; *Black* v. *Bailey,* 142 Ark. 201, 218 S. W. 210; *Pool* v. *Cross County Bank,* 199 Ark. 144, 133 S. W. 2d 19; *Clemenson* v. *Rebsamen,* 205 Ark. 123, 168 S. W. 2d 195. Particularly we mention the language in *Booe* v. *Vinson:*

"The American rule is likewise given in *Heaton* v. *Dickson,* 153 Mo. App. 312, 133 S. W. 162, citing *Nichols* v. *Eaton,* 91 U. S. 716, and numerous other cases. See, also, Perry on Trusts, § 286a.

"In *Heaton* v. *Dickson, supra,* the court held: 'A mere direction that "my wife and my children and their heirs shall receive quarterly from my executor one-fifth each from the net income of my real estate" is not suffi-cient to signify an intention to create a spendthrift trust.'

"The court said, further: 'It therefore appears that, although one may settle an estate in trust, with an equitable use in another for life, with a limitation against alienation and free from the claims of creditors, the presumption of the law is that he has not done so, unless either express words to that effect are set forth, or a clear and undoubted intention of the same is manifested in the will. If there are no express words in the will fixing a restraint against alienation and withholding the income from other creditors, other language relied upon as reflecting such intention must import it to be clear and undoubted.'

"The words, 'for support and maintenance,' in an instrument creating a trust estate in favor of another for life alone or in themselves, have been held insufficient to manifest such clear and undoubted intention on the

part of the testator or settler to restrain the equitable interest in the income from alienation or remove it from the reach of creditors, or to characterize it as a spendthrift trust.

"Likewise, it has been determined that the income of an estate conveyed to the widow for life, 'to her use and benefit—for her comfort and support,' cannot, by the use of such words, be withdrawn from creditors, and that they were without force as a limitation upon the absolute gift of the income from the estate. *Wenzel* v. *Powder, supra; Maynard* v. *Cleaves,* 149 Mass. 307, 21 N. E. 376; *Girard Life Ins. & Trust Co.* v. *Chambers,* 46 Pa. 485, 86 Am. Dec. 513."

In *Poole* v. *Cross County Bank* the following appears: "A mere trusteeship, even though it is for the protection of the beneficiaries, ought not, as a matter of taste, if for no other reason, to be called a 'spendthrift trust.' Only where there is added to the trusteeship express restraints on alienation is it justifiable to call the creation a spendthrift trust."

The text books are in accord with our own cases. 69 C. J. 697, 25 R. C. L. 357, the American Law Institute's Restatement of the Law of Trusts, § 152.

In the case at bar we find no language in the will that constitutes any restraint on the beneficiaries, and the only part of the will that contains any restriction on the trustees is found in paragraph twenty-two as previously copied. Subdivision "A" of paragraph twenty-two requires the trustees to render an annual statement to each beneficiary. Subdivision "B" of paragraph twenty-two allows the trustees to receive reasonable compensation. Subdivision "C" is the so-called "dire extremity" section which will receive further consideration in a subsequent part of this opinion. But there is nothing in this subdivision "C" that prohibits the beneficiary, (Mrs. Locher in the case at bar), from selling, assigning, or transferring all her annual income from the trust during her life. This subdivision "C" gives an added right and power to the trustees to help

Mrs. Locher in their discretion in the event of her "dire extremity"; but there is no restriction or restraint on Mrs. Locher. Indeed, in paragraph fifteen of the will Mrs. Locher receives the trust income *for life*—and this is not ended if seized by process or execution. Neither the classic words of a spendthrift trust nor the "undoubted intention" of the testatrix appear in the will (wills) in question; so we hold that there was no spendthrift trust created or shown.

Neither does *Fortner* v. *Phillips,* (124 Ark. 395, 187 S. W. 318, or *Phillips* v. *Phillips,* 143 Ark. 240, 220 S. W. 52), afford any support to appellants; because the will in that case was entirely different from the will in the case at bar. Mr. Justice Wood pointed out in that case: the will did not vest any estate in James Phillips; no property right was conferred on him; no trust was set up for him. Whereas, in the case at bar, Mrs. Locher was devised a share for life in a trust estate; she was entitled to reports at stated intervals; and was bequeathed all the income earned by her share in the trust estate. So, in the case at bar, a "Trust for Support" was not shown.

V. *Is the Interest of Mrs. Locher Subject to Seizure?*

Many of the cases and authorities already cited throw light on this question; but we also mention the following: In 21 C. J. S. 1065 in discussing property that may be reached by creditors' suit it is stated that a vested interest in an estate can be seized; and in 21 C. J. S. 1068 it is stated: "Any beneficial interest of a debtor in real or personal property which cannot be reached by regular process of law and is not expressly exempted by statute may be reached by a creditors' bill and subjected to payment or satisfaction of the debt; . . ." In 32 Ann. Cas. 945, there is an exhaustive note on the subject "property reachable by creditors' bill"; and cases from many jurisdictions are cited to sustain the statement to-wit: "It may be stated generally that the interest of a debtor under a trust may be reached by a creditors' bill unless it has been placed beyond the reach

of his creditors by a valid provision in the instrument creating the trust.''

In 26 R. C. L. 1268, the rule is stated: ''If property is conveyed in trust, so that the trustee shall take the rents and profits and apply them to the support and maintenance of designated persons during their lives (as distinguished from a mere right of support out of a fund), the beneficiaries have the right to the whole of the fund thus created and not a mere right to support out of it; the trust created is not a spendthrift trust, but the interest of the beneficiaries is assignable and may be subjected to the payment of their debts by proceedings in equity.''

We, therefore, reach the conclusion that the life income of Mrs. Locher from the trust is subject to seizure just as was decreed by the Crawford chancery court in this cause.

### VI.  *What of the "Dire Extremity" Clause?*

We have heretofore reserved consideration of this question, because it is a separate angle of the controversy; yet it must be discussed in order to give full effect to the will. Subdivision ''C'' of paragraph twenty-two is the so-called ''dire extremity'' clause, and we have previously copied it in this opinion in disposing of the contention about a spendthrift trust. Under this clause the testatrix gave the trustees the right to go into the *corpus* of the trust to aid a beneficiary, when, in the judgment of the trustees, such was direly necessary.

The seizure of the income from the trust by the appellee cannot, and does not, cancel this right of the trustees. Even though they pay the income to the appellee on its judgment, still, if some dire extremity should occur to Mrs. Locher, the trustees could still aid her; but they will be accountable not only to the remaindermen but also to the judgment creditor for failure to properly evaluate the existence of the dire extremity or the amount of aid to be so rendered. As long as the trustees exercise their ''best discretion'' (as stated in the clause), they subject themselves to no greater liability to the

judgment creditor than they would at all times have been subjected to in favor of the remaindermen.

It, therefore, follows that the decree of the Crawford chancery court is in all things affirmed.

McHANEY, J., dissenting. It occurs to me that the affirmance of this decree may turn out to be an empty victory for the appellee, or it may destroy or circumvent the clear intention of the testators as expressed in the so-called "dire extremity" clauses of their wills. It appears from the record that the trustees, appellants, have already impaired the corpus of the trust by advancements to Mrs. Locher, under said clause. Appellee cannot collect any of the income from the trust until said impairment has been repaired. The taking of all the income from the trust by appellee would appear to create a "dire extremity" in Mrs. Locher's condition at once, absent, of course, other sufficient income to maintain her and her family, and, perhaps, an "imperious necessity affecting a beneficiary or his family," all of which is left to the judgment of the trustees. As to what is a "dire extremity" or "imperious necessity," and "what amount of the capital is necessary to be used," the will says "the trustees shall exercise their best discretion." So, the probability is that the *corpus* or capital will have to be further impaired which "shall be repaired out of the future income of the trust fund." Otherwise the trust fund might all be consumed in the support of the life tenant and nothing left for remaindermen. If this should result, appellee has won an empty victory.

My further view is that the result reached by the majority creates a condition which is contrary to the clear purpose and intent of the testators as expressed in their wills. The purpose was to give Mrs. Locher the income from the trust fund for life with remainder to the heirs of her body, and she has living children. The total of the *corpus* of the fund is small. As of August 9, 1943, it amounts to $22,303.64 under both wills, and the total income for the fiscal years ending in 1943, was $1,085.70. The income has not been sufficient in the past to meet

Mrs. Locher's requirements and the trustees have, on three separate occasions, acting under the "dire extremity" clause, made impairments of the *corpus,* all of which has been repaid from income, except $100. If appellee is permitted to take all the income, after the impairment is repaid, she will, no doubt, then be in "dire extremity" which could only be met by an impairment of the *corpus,* which, in time, might reasonably take all the principal and leave nothing from which income could arise, and nothing for the "heirs of her body." It seems to me that by force of necessity, in order not to nullify the wills in this respect, the income from the trust fund was intended to be inalienable, and that the *corpus* of the trust was to be held unimpaired, except in case of "dire extremity" of Mrs. Locher or her family, which would be in addition to the income. In other words, if all the income was insufficient to meet her necessities, then only could the trustees invade the *corpus* for her benefit, and it was not contemplated that she could sell or alienate the income, or that it would be subject to be taken away from her by creditors. To permit this suit to succeed nullifies and destroys the clear purpose of the testators, which may not be done. Under all the decisions of this court a will should be construed to effectuate the purpose of the testator, if not contrary to some rule of law.

I, therefore, respectfully dissent and am authorized to say that Mr. Justice Holt concurs in the views here expressed.